# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA


**Erik VanOvermeiren,**                           Civ. No. 12-1352 (DWF/AJB)

                    Plaintiff,

                                        **REPORT AND RECOMMENDATION**

**v.**

**Carolyn W. Colvin,**[1]

**Commissioner of Social Security**,

                    Defendant.

_____

Lionel H. Peabody, Esq., P.O. Box 10, Duluth, MN 55801-0010, for Plaintiff.

Gregory Brooker, Asst. United States Attorney, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for the Commissioner.


ARTHUR J. BOYLAN, United States Chief Magistrate Judge

The matter is before this Court, United States Chief Magistrate Judge Arthur J. Boylan, for a report and recommendation to the District Court on the parties' cross-motions for summary judgment. *See* 28 U.S.C. § 636(b)(1) and Local Rule 72.1. This Court has jurisdiction under 42 U.S.C. § 405(g). Based on the reasoning set forth below, this Court recommends that Plaintiff's motion for summary judgment [Docket No. 6] be denied and Defendant's motion for summary

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. http://www.ssa.gov/pressoffice/factsheets/colvin.htm

judgment [Docket No. 15] be granted.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Procedural History

Plaintiff Erik VanOvermeiren protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") on August 13, 2008, alleging disability beginning September 17, 2002, based on shoulder and back injuries and Charcot Marie Tooth disease ("CMT").[2] (Tr. 178-92, 260.)[3] Plaintiff was 21-years-old on his alleged onset date. (*Id.*) His applications were denied initially and upon reconsideration. (Tr. 72-75, 80-97.) Plaintiff requested a hearing before an administrative law judge, and the hearing was held on December 7, 2010, before Administrative Law Judge Larry Meuwissen ("ALJ"). (Tr. 98-99, 40-65.) The ALJ issued an unfavorable decision on January 13, 2011. (Tr. 16-39.) On May 4, 2012, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner. (Tr. 2-8.) *See* 20 C.F.R. §§ 404.981, 416.1481. On June 6, 2012, Plaintiff sought review from this Court. The parties then filed cross-motions for summary judgment.

### B.     Factual Background

#### 1.     Shoulder Injury

In March 2003, Plaintiff went to an emergency room for shoulder pain from an earlier work injury. (Tr. 875.) He was diagnosed with post traumatic bursitis with probable rotator cuff tear.

---

[2] Charcot Marie Tooth Disease is a peripheral muscular disorder, a common feature of which is marked wasting of the distal parts of the extremities, usually involving the legs before the arms. *Stedman's Medical Dictionary* ("*Stedman's*") 166 (Lippincott, Williams & Wilkins 27th ed. 2000).

[3] The Court will cite the Administrative Record in this matter, Docket No. 6, as "Tr."

(Tr. 873.)  Plaintiff had a full range of motion and good muscle strength, and was able to do his usual job.  (*Id.*)  When extensive rehabilitation failed to relieve his left shoulder pain, on July 10, 2003, Plaintiff underwent arthroscopic surgery with subacromial decompression and acromioplasty. (Tr. 419-20.)

Plaintiff went to an emergency room on December 14, 2003, for chronic shoulder pain exacerbated by use of his arm.  (Tr. 406.)  Plaintiff was secondarily diagnosed with CMT disease with peripheral neuropathy of the lower extremities.  (*Id.*)  Plaintiff had an arthrogram of his left shoulder on April 28, 2004, indicating a potential tear but no significant changes.  (Tr. 896.) Plaintiff underwent a second left shoulder surgery on August 5, 2004.  (Tr. 393.)

## 2. <u>Low Back Pain</u>

In June 2005, Plaintiff hurt his low back while lifting at work.  (Tr. 480.)  Plaintiff's July 12, 2005 lumbar MRI showed mild narrowing of L5-S1, disc protrusion with annular tear at L4-5 with possible contact with the L5 nerve root, mild disc protrusion with annular tear at L5-S1, and minimal right and mild left neural foraminal narrowing.  (Tr. 458.)  Plaintiff underwent a neurosurgical consultation on September 26, 2005. (Tr. 810.)  On examination, Plaintiff was 5'7" and weighed 232 pounds.  (*Id.*)  Straight leg raise tests were negative and strength was normal in the lower extremities but reflexes were absent.  (*Id.*)  Plaintiff's gait was normal and he could bend well.  (*Id.*)  Dr. Edison McDaniels opined Plaintiff's MRI showed minor degenerative changes without neural impingement. (*Id.*)  He opined Plaintiff could return to work without restrictions.  (*Id.*)

Plaintiff saw Dr. Timothy Morton at Polinsky Medical Rehab Center on December 9, 2005, after completing a work hardening program.  (Tr. 804.)  Plaintiff appeared comfortable throughout the exam but was increasingly upset when discussing the fact that he would be cleared to return to

work.  (*Id.*)  His gait and leg strength were normal.  (*Id.*)  On December 20, 2005, Plaintiff was cleared for "vigorous physical labor."  (Tr. 803.)

Plaintiff was working underneath a truck on April 15, 2006, and his back locked up when he tried to get up.  (Tr. 398.)  He went to an emergency room, where his examination was normal except for significant pain with palpation.  (*Id.*)  Plaintiff was treated for back spasm.  (Tr. 399.)

Plaintiff went to an emergency room again on June 18, 2006, after hurting his low back working in his garage.  (Tr. 395.)  On exam, there was pain with palpation of the left lower lumbar region but no focal neuro deficits.  (*Id.*)

On July 21, 2006, Dr. Wolcott Holt diagnosed Plaintiff with lumbar spondylosis[4] and left sciatica with presumed L5 radiculopathy.  (Tr. 792.)  He ordered an MRI, which showed small disc annular tear at L4-5, very mild disc protrusion at L2-3, mild disc bulge at L4-5, mild disc protrusion at L5-S1 without significant displacement or traversing of the left S1 nerve root, no significant spinal stenosis or neural foraminal narrowing.  (Tr. 792, 447.)  Plaintiff next saw Dr. Eric Rudd for a neurosurgical opinion.  (Tr. 785-88.)  On September 22, 2006, Dr. Rudd reviewed Plaintiff's MRI and did not think there was significant impingement of the nerve root from the L5-S1 disc protrusion.  (Tr. 787.)  He believed removal of the "small, non-impinging central herniations" would do nothing for Plaintiff's pain.  (*Id.*)  He encouraged Plaintiff to return to some form of gainful employment as soon as possible.  (*Id.*)  He restricted Plaintiff to lifting less than fifty pounds occasionally and occasional bending, squatting and climbing.  (*Id.*)

Plaintiff underwent an occupational consultation with Dr. Brian Konowalchuk on October

---

[4] The term spondylosis is often applied nonspecifically to any lesion of the spine of a degenerative nature. *Stedman's* 1678.

5, 2006, reporting no improvement in his low back pain since the date of injury. (Tr. 781-84.) Plaintiff had worked to a 45-pound capacity after completing work hardening the past December. (Tr. 782.) He did small engine repair for two or three weeks, then found a job driving a car, but quit after one month. (*Id.*) He returned to engine repair for two weeks but again quit due to increased back pain. (*Id.*) Plaintiff said he could no longer engage in his hobbies of construction work, woodworking, four wheeling and snowmobiling. (*Id.*)

Plaintiff was mildly agitated and angry during examination. (*Id.*) He had very limited back range of motion but could walk on his heels and toes without apparent difficulty. (Tr. 783.) He appeared somewhat deconditioned but not significantly obese. (*Id.*) Dr. Konowalchuk believed it was in Plaintiff's best interest to try to return to work, recommending medium work duty at full hours. (*Id.*) Plaintiff was also on narcotics, which was not the best option for long-term care. (*Id.*) At the end of October, Dr. Konowalchuk released Plaintiff to work full-time with occasional lifting of fifty pounds, and frequent lifting less than twenty pounds, starting part-time until he could work a full day. (Tr. 637, 650, 778, 783-84.)

One month later, Plaintiff told Dr. Konowalchuk he had increased back pain. (Tr. 633.) On examination, Plaintiff was comfortable and moved without significant difficulty. (*Id.*) Strength and reflexes were intact but he had decreased sensation in the left foot. (*Id.*) Dr. Konowalchuk ordered a left leg EMG to look for progression of CMT or left leg radiculopathy. (Tr. 634.) The EMG study on December 7, 2006 did not show evidence of left lumbosacral radiculopathy but injury to the sciatic nerve could not be ruled out. (Tr. 629.) Dr. Konowalchuk reduced Plaintiff's lifting restriction to 35 pounds, not due to a structural abnormality, but because Plaintiff felt it was the most he could lift safely. (Tr. 625.) On examination, Plaintiff moved without significant difficulty and

walked without a limp or abnormal gait.  (*Id.*)  He could forward flex to his knees and there was no active spasm.  (*Id.*)  Plaintiff reached maximum medical improvement.  (*Id.*)  He said he wanted to discontinue narcotics and Dr. Konowalchuk agreed, prescribing Cymbalta instead.  (Tr. 630.)

Plaintiff underwent an independent medical evaluation with Dr. Paul Cederberg for his worker's compensation claim on February 1, 2007.  (Tr. 536-41.)  Plaintiff's back was tender and reflexes were absent at the ankles.  (Tr. 538.)  Strength in his legs was intact, and he walked with a slight limp on the left.  (Tr. 538-39.)  Dr. Cederberg opined Plaintiff should be restricted to lifting 35 pounds, sit or stand as tolerated, and avoid repetitive bending and twisting his back.  (*Id.*)  A CT scan of Plaintiff's lumbar spine on April 26, 2007 showed mild degenerative changes of L4/5 and L5/S1 and disc herniation with partial occlusion of the S1 nerve root on the left side.  (Tr. 443.)

On May 1, 2007, Plaintiff's left leg pain had worsened.  (Tr. 759.)  On examination, Plaintiff was comfortable and moved without difficulty.  (*Id.*)  He had limited back range of motion, but leg strength was intact.  (*Id.*)  An EMG showed no evidence of left radiculopathy.  (Tr. 758.)  Dr. Konowalchuk referred Plaintiff to Dr. James Schwender at Twin Cities Spine Center for evaluation in July 2007.  (Tr. 935-36.)  On examination, Plaintiff walked with a slightly antalgic[5] gait favoring the left, but he could toe and tandem walk.  (Tr. 936.)  He was significantly limited in lumbar range of motion but had full leg strength.  (*Id.*)  Dr. Schwender recommended avoiding surgery as long as possible.  (*Id.*)  Dr. Konowalchuk then gave Plaintiff permanent restrictions of lifting thirty pounds occasionally, fifteen pounds frequently, forty pounds rarely, push and pull no more than forty pounds, and alternate sitting and standing.  (Tr. 599.)

---

[5] Antalgic gait is where the stance phase of walking is shortened on the weight-bearing side, caused by pain.  *Stedman's* 722.

On November 2, 2007, Plaintiff continued to demonstrate lumbar stiffness and tightness but he moved comfortably without difficulty.  (Tr. 598.)  Plaintiff was in an active job search.  (*Id.*)  On September 4, 2008, Dr. Schwender offered Plaintiff surgery based on his MRI showing an L5-S1 disc herniation pressing on the nerve.  (Tr. 941.)[6]  The surgery would relieve leg symptoms but not back pain.  (*Id.*)  Plaintiff elected to have left L5-S1 discectomy decompression on January 14, 2009.  (Tr. 979-80.)  Plaintiff was kept off work postoperatively.  (Tr. 989, 991-93.)

In physical therapy on February 24, 2009, Plaintiff walked without a limp.  (Tr. 1156.)  He could repetitively heel and toe walk but with decreased ability to maintain toe or heel raise on the left.  (Tr. 1157.)  Plaintiff had a generalized loss of lumbar motion.  (*Id.*)  One month later, Plaintiff walked with an antalgic gait.  (Tr. 1160.)  Plaintiff reported sore back muscles from increased activity levels.  (*Id.*)

Plaintiff saw Dr. Holt on March 6, 2009, complaining of some pain down the left leg, but he "readily got up and moved around."  (Tr. 1000.)  Reflexes were absent in Plaintiff's legs and decreased in his arms.  (*Id.*)  There was positive Phalen's sign but no atrophy.  (*Id.*)  Dr. Holt diagnosed "HNPP[7] which probably precludes full recovery from radiculopathies in his back."  (*Id.*)  Dr. Holt did not find clear progression of neuropathy, only that Plaintiff's pain was not gone.  (*Id.*)  Plaintiff was taking gabapentin and hydrocodone for pain.  (Tr. 1001.)

Dr. George Walcott reviewed Plaintiff's social security disability file at the request of the SSA and completed a Physical Residual Functional Capacity Assessment regarding Plaintiff on April 2, 2009.  (Tr. 1029-36.)  He opined Plaintiff could occasionally lift and carry twenty pounds,

[6] Dr. Fred Ekberg read the MRI and concluded there was questionable compression of the left S1 nerve root.  (Tr. 942-43.)

[7] HNPP is hereditary neuropathy with liability to pressure palsies.  (Tr. 601-02.)

7

and ten pounds frequently. (Tr. 1030.) Plaintiff could sit six hours in an eight-hour day, and stand and/or walk six hours in an eight-hour day. (*Id.*) Plaintiff could never balance or climb ladders, ropes or scaffolds. (Tr. 1031.) He could occasionally stoop and bend. (*Id.*) His gross and fine manipulation were limited to frequent.[8] (Tr. 1031-32.)

On April 9, 2009, Plaintiff's gait was nonantalgic, and Plaintiff's physical therapist noted he had improved overall. (Tr. 1161-62.) A week later, Dr. Schwender examined Plaintiff, and straight leg raise tests were negative, strength in the legs was symmetric without focal motor deficits, and sensation was grossly intact throughout. (Tr. 1199.) At the end of April, Plaintiff started work conditioning. (Tr. 1163.)

Plaintiff saw Dr. Douglas Wendland at St. Luke's Occupational Health Clinic on May 15, 2009. (Tr. 1106-09.) In his review of Plaintiff's medical records, Dr. Wendland noted that Plaintiff said his underlying diagnosis of CMT "caused some functional impairment but no disability" and there had never been any pain associated with CMT. (Tr. 1107.) On examination, Plaintiff could toe walk but had mild difficulty with heel walk. (Tr. 1108.) Dr. Wendland recommended a functional capacity evaluation for work restrictions. (*Id.*) In physical therapy on September 8, 2009, Plaintiff reported increased leg pain and walked with a slight antalgic gait, but he could perform on the treadmill for twenty minutes without an antalgic gait. (Tr. 1173.) The next day, Plaintiff felt much better, reporting no leg pain. (Tr. 1174.) Plaintiff reached a lifting limit of forty pounds in physical therapy on September 24, 2009. (Tr. 1175.)

Plaintiff underwent a functional capacity evaluation ("FCE") by physical therapist Brett Osborne on October 14-15, 2009. (Tr. 1085-90.Based on the evaluation, Osborne opined Plaintiff

---

[8] Frequent is defined on the PRFCA form as less than two-thirds of the time, but more than one-third, which is defined as occasional.

could tolerate material handling activities under the thirty pound range "up to frequent," and ten pounds constantly. (Tr. 1087.) Plaintiff should also limit his repetitive forward bending or static forward bending position, and have the ability to sit or stand for brief periods throughout an eight-hour day. (*Id.*)

On October 30, 2009, Plaintiff saw Dr. Wendland. (Tr. 1082-83.) On examination, Plaintiff's deep tendon reflexes were absent in both legs, his leg strength was normal, and he could heel and toe walk. (Tr. 1083.) Dr. Wendland found maximum medical improvement and recommended permanent work restrictions of lifting and carrying 25 pounds occasionally, bending and twisting occasionally, and push or pull a maximum of 25 pounds. (*Id.*)

Dr. Cederberg performed another independent medical evaluation on January 6, 2010. (Tr. 1213-15.) Plaintiff was working as a delivery person for a pharmacy three days per week. (Tr. 1214.) He was using heat, ice and over-the-counter medications for pain. (*Id.*) On examination, He had absent tendo achilles reflex, likely due to CMT disease, with some atrophy in his feet. (Tr. 1215.) Motor strength in his legs was intact. (*Id.*) Dr. Cederberg opined Plaintiff could work full-time within the restrictions of his functional capacity evaluation of October 2009. (*Id.*)

Dr. Wendland evaluated Plaintiff for increased back pain on February 10, 2010, and recommended epidural steroid injection and decreased work hours. (Tr. 1078-79.) Dr. Cederberg issued a supplemental report on March 17, 2010, opining that no further medical treatment was needed other than over-the-counter pain medication and the work restrictions he had given. (Tr. 1222.) Plaintiff then saw Dr. Wendland on March 25, 2010, and complained of continued constant pain. (Tr. 1074.) Dr. Wendland prescribed Lyrica. (*Id.*) On April 9, 2010, Plaintiff told Dr. Wendland that Lyrica was helping his leg pain, but Workers Compensation would no longer pay for

it. (Tr. 1071.) In June 2010, Dr. Wendland gave Plaintiff work restrictions for maximum lift, push, pull and carry 25 pounds, and bend and twist occasionally. (Tr. 1065.)

### 3. Neuropathy

When Plaintiff was eighteen years old, he had an EMG to diagnose weakness and paresthesias in the right arm. (Tr. 574.) The results were markedly abnormal, showing evidence for multifocal demylenation[9] in the brachial plexus and also involving nerves at the wrist, forearm and elbow, with mild axonal loss.[10] (Tr. 575.) Superimposed carpal tunnel syndrome and ulnar neuropathy at the elbow could not be ruled out. (*Id.*)

On June 18, 2003, Plaintiff was referred to Dr. Steven Erlemeier at Duluth Clinic for evaluation of left upper extremity pain and tingling, with some tingling in the hands and toes. (Tr. 565.) After two EMG studies showed left peroneal[11] neuropathy, Dr. Erlemeier recommended genetic testing for pressure palsy[12] and CMT disease. (*Id.*) The genetic tests indicated a deletion of the PMP-22 gene associated with HNPP. (Tr. 601-02.) Therefore, Plaintiff was expected to be affected by or predisposed to developing HNPP. (Tr. 601.)

Dr. Erlemeier evaluated Plaintiff again on November 14, 2003, and his impression was chronic muscle spasm and winging of the left scapula, probably from pressure palsy. (*Id.*) He kept Plaintiff off work. (*Id.*) Dr. Erlemeier stated "[l]ong-term work issues are somewhat problematic

---

[9] Demylenation is the loss of myelin with preservation of the axons or fiber tracts. *Stedman's* 472. Myelin is the material that makes the myelin sheath, which surrounds a nerve fiber. *Id.* at 1168.

[10] Axons are a single part of the nerve cell that under normal conditions conduct nervous impulses away from the cell body and the other parts of the nerve cell. *Stedman's* at 177.

[11] Peroneal refers to the fibula, the small bone of the arm and leg. *Stedman's* 1354.

[12] Pressure palsy, also called pressure paralysis, is paralysis due to compression of a nerve, nerve trunk, plexus, or spinal cord. *Stedman's* 1301, 1311.

in the setting of the hereditary propensity to pressure palsy.  Permanent disability may be necessary in the long-term." (*Id.*)  He prescribed physical therapy, Flexeril and Ultram.  (*Id.*)  In follow up on December 10, 2003, Plaintiff's neurological examination showed limited winging of the left scapula and fairly normal deep tendon reflexes and motor function.  (Tr.  556.)  Nerve conduction studies showed left median carpal tunnel syndrome and left ulnar Guyon's tunnel syndrome.[13]  (*Id.*)

Plaintiff saw Dr. Wolcott Holt at Duluth Clinic on January 14, 2004.  (Tr. 851-52.)  On examination, Plaintiff's gait and station were normal.  (Tr. 852.)  He had slightly high arches, no Tinel's or Phalen's sign, and no winging of the scapulae.  (*Id.*)  Dr. Holt stated:

> [t]his is a patient who has hereditary neuropathy in the legs and arms, plus a PMP22 deletion, which really suggests that , although he may have Charcot Marie Tooth, he also has a propensity . . . for pressure palsy, which explains his foot drop in the past that improved. . . . [w]atching out for getting compressive neuropathy is mandatory. What is not clear is whether the pain in the shoulder has anything to do with his HNPP, and really I think it is more likely it does not.

(Tr. 852.)  Dr. Holt prescribed Neurontin.  (*Id.*)

On February 26, 2004, Plaintiff reported that increased Neurontin made him very tired and disorganized.  (Tr. 849.)  Plaintiff's gait and station were normal.  (*Id.*)  Dr. Holt noted, "[Plaintiff] is aware if he puts pressure on his wrists even for a couple minutes he will have an engraphia[14] hand." (*Id.*)  Plaintiff's leg reflexes were intact and polyneuropathy was not present (*Id.*)  Dr. Holt noted Plaintiff was doing fairly well, and they would treat his nerve pain with seizure medicine, Trileptal.  (*Id.*)  On April 29, 2004, Dr. Holt  opined that Plaintiff's neuropathic problem was stable but would be long-term and pressure palsies were always a significant difficulty.  (Tr. 842.)

---

[13] Guyon's tunnel syndrome is entrapment or compression of the ulnar nerve. *Stedman's* 1755.

[14] Engraphia is the formation of engrams, a physical change on the nervous system as a result of experience or the repetition of stimuli. *Stedman's* 596.

On June 15, 2006, Plaintiff saw Dr. Robert Pierpont at Duluth Clinic for intermittent tingling in the arms and legs. (Tr. 800.) He had full strength in his upper extremities and no gait disturbance. (*Id.*) Dr. Pierpont recommended neurological evaluation. (*Id.*) Several days later, Plaintiff saw Dr. Holt. (Tr. 797.) Plaintiff said that rarely, if he stood too long, his toes would tingle. (*Id.*) If he bent his wrists for too long, his hands tingled. (*Id.*)

Dr. Holt stated:

> This is a patient who has mild lumbar spondylosis at L4, chronic low back pain, an intolerable to him work situation, who also has hereditary neuropathy (palsy) and has some mild lower extremity reflexes and is unable to tolerate whatsoever any pressure on his nerves without significant abnormalities.

(*Id.*) Dr. Holt recommended physical therapy. (*Id.*) He noted that Plaintiff gave up his former job and was working with small engines. (*Id.*)

On July 21, 2006, Plaintiff had areflexia in the legs and decreased vibratory sensation, consistent with CMT, and mild heel drop when walking. (Tr. 792.) About six months later, Plaintiff's nerve conduction studies showed evidence of mild left peroneal and left tibial neuropathies without significant axonal process. (Tr. 463.) Proximal injury to the sciatic nerve could not be ruled out. (*Id.*) There was no evidence of left lumbosacral neuropathy, peripheral neuropathy or myopathy. (*Id.*) Plaintiff had repeat nerve conduction studies on May 21, 2007. (Tr. 758.) EMG findings were compatible with the diagnosis of primary peroneal neuropathy, and there was no evidence of left radiculopathy. (*Id.*) Dr. Brian Konowalchuk at Duluth Clinic opined that the EMG was most consistent with peroneal nerve dysfunction associated with CMT. (*Id.*)

Dr. Holt wrote a disability opinion letter for Plaintiff on August 19, 2010. (Tr. 1178-79.) He reviewed Plaintiff's medical records through March 6, 2009 and diagnosed lumbar strain with

preexisting lumbar degenerative changes and preexisting hereditary sensorimotor neuropathy. (Tr. 1179.)  Dr. Holt opined Plaintiff could sit for six hours and stand/walk for up to two hours.  (*Id.*)  Plaintiff could lift ten pounds up to one third of the day and not more than twenty pounds.  (*Id.*)  Stooping, crouching and bending were likely to lead to increased pain.  (*Id.*)  Dr. Holt stated:

> I think that the full-time employment is not to be anticipated in light of his progressive neuropathy complicated by post laminectomy syndrome with history and findings suggestive and consistent with a residual left L5 radiculopathy.

(*Id.*)

Plaintiff saw Dr. Holt primarily for right heel pain on August 20, 2010.  (Tr. 1196-97.)  On examination, Plaintiff walked with an antalgic limp on both sides.  (Tr. 1196.)  He could walk on his toes but it increased his pain.  (*Id.*)  He had positive Tinel's sign on the left foot and decreased vibration in the feet.  (Tr. 1196-97.)  He had weakness in the hands and positive Tinel's and Phalen's sign.  (Tr. 1197.)  Dr. Holt questioned whether it was left L5 radiculopathy or plantar fasciitis[15] causing "the change in [Plaintiff's] ambulatory behavior."  (*Id.*)  Plaintiff complained of dropping things, and Dr. Holt noted the numbness in Plaintiff's hands would only get worse.  (*Id.*)  He recommended evaluation for plantar fasciitis and EMG studies  (*Id.*)  On September 23, 2010, EMG of Plaintiff's hands indicated severe bilateral carpal tunnel syndrome and severe bilateral cubital tunnel syndrome[16] with active denervation "in a setting of" HNPP.  (Tr. 1208.)

Dr. Holt referred Plaintiff to Dr. Douglas Hoffman for evaluation of heel pain.  (Tr. 1193.)

---

[15] Plantar fasciitis is inflammation of the plantar fascia causing foot or heel pain. *Stedman's* 652. Plantar fasciitis is one of the most common causes of heel pain, particularly in runners, people who are overweight, and those who wear shoes with inadequate support. http://www.mayoclinic.com/health/plantar-fasciitis/DS00508

[16] Cubital tunnel syndrome is a group of symptoms that develop from compression of the ulnar nerve within the cubital tunnel at the elbow. *Stedman's* 1751.

On September 7, 2010, Plaintiff said his heel pain began several months ago, and he also had some tingling and frequent foot cramping. (*Id.*) Plaintiff did not walk with antalgic gait. (Tr. 1194.) An x-ray of his left foot suggested plantar fasciitis. (*Id.*) Dr. Hoffman recommended orthotics and physical therapy. (*Id.*)

On November 10, 2010, Dr. Holt responded in writing to questions from Plaintiff's counsel. (Tr. 1225.) He stated that Plaintiff fit the criteria for Social Security Listing 11.14, peripheral neuropathy with significant disorganization of motor function in both hands and left leg, with disturbance of gross and dexterous movements in his hand, specific gait standing, and walking on an ongoing basis. (*Id.*) He added that Plaintiff would be limited to firm grasp, light grasp and lifting less than one third of an eight-hour day, and not on a repetitive basis. (*Id.*)

Plaintiff saw Dr. Holt again on March 15, 2011, complaining of increased difficulty in his job as a delivering agent. (Tr. 1231.) Plaintiff also said he had no health insurance. (*Id.*) He had pain in the bottom of his foot when walking, and it was much better when he had his feet up on a recliner. (*Id.*) On examination, his gait was "fairly good with a left antalgic limp." (*Id.*) He had difficulty tandem walking with his eyes closed. (*Id.*) Dr. Holt diagnosed HNPP, carpal tunnel, and progressive diabetic neuropathy. (Tr. 1232.) He stated, "[a]n occupation that did not require a lot of ambulation, ability to move his legs and get them up would be appropriate." (*Id.*) Custom orthotics might help with plantar fasciitis, but cost was prohibitive for Plaintiff at that time. (*Id.*)

### 4. Case Notes from Wisconsin Job Center

Plaintiff talked to Job Counselor Michael Meehan about his vocational plans on March 23, 2007. (Tr. 224.) Plaintiff considered opening his own cabinet shop or a handyman business. (*Id.*) On November 12, 2007, Meehan noted Plaintiff had a lead on a job as a bartender, and also was

checking on mechanical work.  (Tr. 222.)  Plaintiff was looking into small business plan development and retraining.  (*Id.*)  On March 12, 2008, Meehan noted Plaintiff was trying to get a small engine business started, but he was open to other employment.  (*Id.*)

### 5. Disability and Function Reports

Plaintiff completed the form "Disability Report - Appeal - Form SSA-3441" on November 13, 2008.  (Tr. 281-87.)  He indicated he was very limited in the ability to work because of back pain, leg cramping, and progressive numbness in his hands and feet.  (Tr. 286.)  He expected to have surgery but it was not yet scheduled.  (Tr. 282.)  Plaintiff updated this form on April 30, 2009, when his pain and frustration were becoming unbearable to him.  (Tr. 310.)  He had difficulty attending to his personal needs due to pain in the back and leg and numbness in the feet and hands.  (Tr. 309.)  He had "no great" improvement after surgery in January 2009.  (Tr. 305.)

### D. The Administrative Hearing

At the hearing before the ALJ on December 7, 2010, Plaintiff testified as follows.  He is 29-years-old, five feet seven inches tall and weighs 195.  (Tr. 44.)  He lived with his parents and had a girlfriend.  (Tr. 45.)  Plaintiff is a high school graduate and had on the job training to drive a forklift and boom truck at a lumber yard.  (*Id.*)  After working at the lumber yard and then getting unemployment, Plaintiff got a job delivering pharmaceutical supplies, three days a week.  (Tr. 46-47.)  He did not believe he could work five days a week because he had back pain, and numbness and tingling in his legs.  (Tr. 47.)  He tried multiple times to work more days but his back and leg pain flared, and he could not work.  (Tr. 51.)  He had lifting restrictions which prevented him from carrying some of the items he had to deliver.  (Tr. 53.)  Plaintiff also had carpal tunnel syndrome and needed surgery but could not pay for it because he did not have insurance.  (Tr. 48.)

Plaintiff described the nerve problem with his hands. (Tr. 54.) He was susceptible to pinching a nerve, and when he did so, his fingers curled and might stay that way for a month. (*Id.*) His hands were numb and tingling, with little strength. (Tr. 54-55.) He thought he could use his hands for activities like moving boxes one third of an eight-hour day, and fine finger dexterity half of a day if he pushed himself. (Tr. 56.) Plaintiff thought he could be on his feet only four hours a day due to back pain and his feet going numb. (Tr. 57.) His feet went numb from standing after five to twenty minutes. (Tr. 58.) Plaintiff sometimes drank alcohol to deal with pain. (*Id.*) Plaintiff believed he reinjured his back after his last surgery, so his pain was now worse. (Tr. 58-59.) He had constant pain down his left leg with varying intensity. (Tr. 59.)

Plaintiff's hobbies were small engine repair and woodworking. (Tr. 49.) He could no longer go snowmobiling, four wheeling or fishing. (*Id.*) Plaintiff had prescription pain medications but they made him groggy, and he could not drive if he took them. (*Id.*)

Ed Utities testified as a vocational expert. (Tr. 60, 335, 351-52.) After establishing that a person limited to light work could not perform Plaintiff's past work in a lumberyard, the ALJ asked whether a person of Plaintiff's age, education and the physical capacity for light work with no climbing ropes, ladders or scaffolds, no heights or hazardous machinery, no constant fingering and handling, and occasional bending could perform other jobs in the national economy. (Tr. 60- 61.) The VE testified such a person could perform jobs such as sub assembler, assembler marking devices, assembler mechanical pencils, vacuum bottle assembler,[17] and other light benchwork assembly jobs of which there were more than 5,000 in the State of Wisconsin. (Tr. 61.) The VE

[17] Respectively, these jobs are found in the Dictionary of Occupational Titles ("DOT") under DOT Codes 729684054, 733687010, 733687014, and 739687194.

added that the jobs would not involve balancing and required simple grasping at least two-thirds of a normal workday, contrary to Dr. Holt's work restrictions. (Tr. 62-63.) Plaintiff's counsel asked whether a person limited to sitting six hours, being on his feet two hours, lifting not more than twenty pounds for one-third of the day, and limited stooping, crouching, and bending due to pain could perform the jobs identified. (Tr. 63.) The VE said those restrictions described sedentary work and would preclude the jobs he identified. (*Id.*) Counsel also asked whether a person who would be absent from work one day a week due to pain would preclude work. (Tr. 63-64.) The VE's answer was inaudible. (Tr. 64.)

### D. The ALJ's Decision

On January 13, 2011, the ALJ issued his decision denying Plaintiff's applications for DIB and SSI. (Tr. 16-32.) The ALJ followed the five-step sequential evaluation set forth in the agency's regulations. *See* 20 C.F.R. §§ 404.1520, 416.920. The Eighth Circuit Court of Appeals has summarized these steps as follows: (1) whether the claimant is currently engaged in "substantial gainful activity"; (2) whether the claimant suffers from a severe impairment that "significantly limits the claimant's physical or mental ability to perform basic work activities"; (3) whether the claimant's impairment "meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education and work experience)"; (4) "whether the claimant has the residual functional capacity ("RFC") to perform his or her relevant past work;" and (5) if the ALJ finds that the claimant is unable to perform his or her past relevant work, then the burden is on the ALJ "to prove that there are other jobs in the national economy that the claimant can perform." Fines v. Apfel, 149 F.3d 893, 894-95 (8th Cir. 1998).

At the first step of the evaluation process, the ALJ determined that Plaintiff had engaged in

substantial gainful activity during the period from the alleged onset date of September 17, 2002 through April 2003, but there was a subsequent continuous 12-month period where he did not engage in substantial gainful activity. (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 *et seq.*) (Tr. 21-22.) At the second step of the process, the ALJ found that Plaintiff had severe impairments of degenerative disc disease status post compressive laminectomy at L5-S1, obesity, CMT disease, and severe bilateral carpal tunnel syndrome. (20 CFR 404.1520(c) and 416.920(c)). (Tr. 22.)

At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). (Tr. 23.) The ALJ rejected Dr. Holt's opinion that Plaintiff met Listing 11.14 because it was not supported by objective medical evidence. (Tr. 24.) Plaintiff's disorganization of motor function and disturbance of gross and dexterous movements with his hands arose "in conjunction with claimant's severe carpal tunnel syndrome." (*Id.*) With the appropriate operative treatment, Plaintiff's carpal tunnel syndrome would not be expected to last twelve months or more. (*Id.*)

The ALJ also rejected Dr. Holt's opinion that Plaintiff disorganization of motor function in his legs resulted in sustained disturbance of gross movements, gait or station. (*Id.*) In March 2009, Dr. Holt found Plaintiff's gait and station to be good. (*Id.*) In February 2009, Plaintiff walked without antalgic gait, could stand without weight shift, and could heel and toe walk repetitively. (*Id.*) In September 2009, he felt better and had no leg pain. (*Id.*)

At the next step of the evaluation process, the ALJ determined that Plaintiff had the residual

functional capacity to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that claimant can never work on ladders, ropes or scaffolds, can never perform work from unprotected heights or around hazardous machinery, can never perform work that requires constant fingering and handling, can at most perform work involving occasional bending.

(Tr. 24.)

The ALJ adopted Dr. Walcott's physical RFC opinion. (Tr. 25-26.) Dr. Walcott was aware of Plaintiff's degenerative disc disease and surgery as well as symptoms related to CMT disease. (Tr. 26.) He noted, however, that Plaintiff's leg and arm strength were good, despite decreased reflexes. (*Id.*) Dr. Walcott found Plaintiff's back impairment was most the most significant impairment, but Plaintiff improved after surgery in January 2009, with normal gait, station and movement in March 2009. (*Id.*) Plaintiff's activities of doing errands, attending appointments, automobile and small engine repair and woodworking were inconsistent with his severe pain complaints. (*Id.*) The ALJ found Dr. Walcott's opinion was supported by substantial evidence in the record as a whole. (*Id.*) The ALJ gave little weight to Dr. Schwender's July 2008 RFC opinion because it preceded Plaintiff's surgery and was inconsistent with Plaintiff's FCE results. (*Id.*)

The ALJ rejected Dr. Holt's opinion that Plaintiff's neuropathy and back injury precluded him from substantial gainful employment. (Tr. 26-27.) Dr. Holt's opinion was not consistent with Dr. Wendland's opinion of Plaintiff's work restrictions based on the FCE. (Tr. 27.) The ALJ noted Plaintiff worked within those restrictions in April 2010. (*Id.*) The ALJ accorded Dr. Wendland's opinion significant weight to the extent it was "consistent with the evidence of record taken as a whole, including medical evidence and the claimant's own statements and behavior." (*Id.*) The ALJ also noted Dr. Holt's opinion was inconsistent with Dr. Cederberg's opinion and the FCE results.

(*Id.*)  The ALJ gave Dr. Cederberg's opinion significant weight but further reduced Plaintiff's maximum lifting.  (*Id.*)

The ALJ also found Dr. Holt's opinion to be inconsistent with Plaintiff's physical therapy treatment records, showing that by late September 2009, Plaintiff could lift and carry forty pounds and perform repetitive walking.  (Tr. 27-28.)  This was inconsistent with Dr. Holt's opinion limiting Plaintiff to lifting 10-20 pounds for only one-third of the day.  (*Id.*)  The ALJ accorded significant weight to the results of the FCE.  (*Id.*)  The ALJ also noted that Plaintiff's own testimony about working as a driver three days a week is inconsistent with Dr. Holt's opinion that Plaintiff is limited to sitting for six hours per day.  (*Id.*)  In an examination in December 2005, Plaintiff was upset that he would be cleared for work, but his examination showed normal gait, no discomfort sitting, and normal strength in the arms and legs.  (*Id.*)

The ALJ discounted Plaintiff's credibility because Plaintiff said he had no improvement following surgery, but February and March 2009 records showed the contrary.  (Tr. 29.) Furthermore, Dr. Schwender's April 2009 medical record showed Plaintiff had symmetric strength in his legs without focal motor deficit and intact sensation.  (*Id.*)  The ALJ also discounted Plaintiff's credibility because he received unemployment benefits, representing he was able and willing to work.  (*Id.*)  He also found Plaintiff's daily activities inconsistent with his alleged functional limitations because prior to his back surgery, he could drive, do laundry and yard work, repair work and woodworking.  (*Id.*)  After surgery, he worked delivering pharmaceutical supplies.  (*Id.*)

Other evidence indicated that in March 2007 Plaintiff was considering work as a bartender or starting a business as a handyman or opening a cabinet shop.  (Tr. 29-30.)  In March 2008, he was trying to get a small engine business started.  (Tr. 30.)  In fact, since 2008, Plaintiff operated a small

engine repair business from his home. (*Id.*) In April and May 2010, Plaintiff reported Lyrica helped his pain. (*Id.*) Plaintiff's treatment with over-the-counter medication, Baclofen, and Lortab as needed was inconsistent with Plaintiff's testimony that he was just barely tolerating working three days per week. (*Id.*)

The ALJ found Plaintiff was unable to perform his past relevant work as a truck driver at a heavy exertional level or a truck driver at a medium exertional level. (20 CFR 404.1565 and 416.965). (Tr. 31.) However, at the fifth step of the disability evaluation procedure, the ALJ found Plaintiff could perform jobs that exist in significant numbers in the national economy, including sub assembler, assembler marking devices, assembler mechanical pencils, and vacuum bottle assembler. (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)). (Tr. 31-32.) Thus, the ALJ determined Plaintiff was not under a disability, as defined in the Social Security Act, from September 17, 2002, through the date of the decision. (20 CFR 404.1520(g) and 416.920(g)). (Tr. 32).

## II.     STANDARD OF REVIEW

Review by this Court is limited to a determination of whether a decision of the ALJ is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); *Davidson v. Astrue*, 578 F.3d 838, 841 (8th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brace v. Astrue*, 578 F.3d 882, 884 (8th Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted)). "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings." *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." *Id*.

In reviewing the record for substantial evidence, the Court may not substitute its own

judgment or findings of fact. *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. *Mitchell v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213 (if supported by substantial evidence, the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding.) Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." *Gavin*, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability benefits. *See* 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she can not perform past work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial gainful activity. *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).

## III. DISCUSSION

Plaintiff makes four arguments in support of his motion for summary judgment. First, Plaintiff asserts he met Listing 11.14. Second, Plaintiff contends the ALJ should have given more weight to Dr. Holt's opinion. Third, Plaintiff argues the ALJ's RFC finding does not accurately describe Plaintiff's work-related limitations. Fourth, Plaintiff contends the ALJ failed to fully and fairly develop the record.

### A.     Listing 11.14

Plaintiff asserts he meets Listing 11.14 for peripheral neuropathies based on his EMG testing in September 2010 showing severe carpal tunnel syndrome and ulnar neuropathy, and his diagnoses of CMT disease and HNPP. Plaintiff also asserts there is evidence that his back injury caused gait disturbance, and the ALJ must consider Plaintiff's condition for the entire time at issue, including

when his back impairment became more severe after February 2010. Even if the Court finds Plaintiff's gait disturbance is not severe enough to meet the Listing, Plaintiff contends he meets the listing based on neuropathy causing disorganization of gross and dexterous movements of both of his hands. Plaintiff asserts the ALJ failed to give good reasons why he did not accept Dr. Holt's opinion that Plaintiff met Listing 11.14.

The Commissioner contends the ALJ's determination that Plaintiff did not meet or equal Listing 11.14 is supported by Dr. Walcott's opinion, the results of the October 2009 functional capacity evaluation, Dr. Cederberg's opinion, Dr. Wendland's opinion, physical therapy records from February through September 2009, Dr. Holt's March 2009 treatment records, and the ALJ's finding that Plaintiff had not established that his hand dysfunction would persist if he pursued the recommended surgery for carpal tunnel. The Commissioner also contends Plaintiff's work activity demonstrates that he did not have disorganization of motor function or sustained disturbance of movement in his upper or lower extremities because he worked three days per week as a delivery driver, and did some woodworking and small engine repair.

In reply, Plaintiff contends Dr. Holt found significant disorganization of motor function in both of Plaintiff's hands and his left leg, establishing that he met Listing 11.14. Plaintiff asserts it was wrong for the Commissioner to assume that carpal tunnel was the cause of his hand symptoms, the symptoms might have been caused by CMT, cubital tunnel syndrome, or his propensity to pressure palsies. Plaintiff asserts there is no medical foundation for the ALJ's conclusion that surgery would successfully treat his hand symptoms. Plaintiff also contends that his inability to pay for surgery is properly considered before the ALJ finds that he is disabled. Plaintiff further contends that because Dr. Holt gave reasons for his opinion that Plaintiff met listing 11.14, the ALJ should have given his medical opinion controlling weight.

Listing 11.14 of 20 C.F.R. Part 404, Subpart P, Appendix 1 provides: "Peripheral neuropathies. With disorganization of motor function as described in 11.04B, *in spite of prescribed treatment*." (emphasis added). Section 11.04B provides "[s]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C). Section 11.00C provides:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combination, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands and arms.

Substantial evidence in the record supports the ALJ's finding that Plaintiff did not have the degree of interference with use of his legs to meet the severity required under Listing 11.14 for peripheral neuropathy, and although some evidence may support an opposite conclusion, the Court must affirm the ALJ's decision when the record supports two contrary conclusions. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005). First, Dr. Walcott indicated that Plaintiff did not meet or equal a listed impairment. *See Jones ex rel Morris v. Barnhart*, 315 F.3d 974, 978 n. 2 (8th Cir. 2003) (ALJ may accord appropriate weight to state agency reviewing physician's opinion that claimant did not meet or equal a listing, even if the finding is implicitly based on the fact that the reviewing physician completed an RFC assessment at the next step of the disability evaluation process). Second, Plaintiff had normal leg strength on examinations in May 2007, July 2007, April 2009, October 2009, and January 2010; and his October 2009 FCE indicated that he "did not report any problems related to standing/walking and no problems were observed." (Tr. 1089.) Plaintiff was occasionally observed to have an antalgic gait, but often his gait was normal. Although

Plaintiff objectively had areflexia and decreased sensation in the feet and legs, he rarely complained to his treating providers of difficulty walking or standing. Thus, substantial evidence in the record is inconsistent with listing level disturbances in Plaintiff's gait and station from lower extremity neuropathy.

Whether Plaintiff met Listing 11.14 for impairments of his hands is a closer call, based on September 2010 findings of severe carpal tunnel and cubital tunnel syndrome, and complicated by Plaintiff's diagnoses of CMT disease and HNPP. These conditions are capable of causing listing level impairment, but here there is substantial evidence in the record that Plaintiff's condition did not cause "sustained disturbance of gross and dexterous movements." Thus, the Court need not address the issue of whether prescribed surgical treatment would ameliorate Plaintiff's hand and arm limitations.

At age eighteen, Plaintiff was found to have a degenerative nerve condition with the possibility of carpal tunnel syndrome, but it did not prevent him from working full-time as a truck driver for a lumber yard from 1997 through April 2005. (Tr. 244, 261.) Among other things, this job required handling, grabbing and grasping big, heavy objects, four hours per day. (Tr. 261.) Based on EMG studies in December 2003, Plaintiff was diagnosed with carpal tunnel and Guyon's tunnel syndrome, but his complaints at that time were of left shoulder pain from a work-related lifting injury, which was successfully treated with surgery in August 2004.

Plaintiff complained little, if at all, of hand symptoms before June 2006, when he had intermittent tingling in his hands and toes. Over the next years, Plaintiff's focus in treatment was on back pain radiating down the left leg, and he did not complain about limited use of his hands or arms. Based on Plaintiff's performance in an objective functional capacity evaluation in October 2009, the evaluator found that Plaintiff could tolerate material handling activities under the thirty

pound range "up to frequent," and ten pounds constantly.

In August 2010, Plaintiff presented to Dr. Holt primarily for evaluation of right heel pain, and Dr. Holt noted Plaintiff had brought in a form from his attorney concerning his low back pain and peripheral neuropathy. On examination, Plaintiff had weakness in his hands and positive Tinel's and Phalen's sign. Plaintiff said he had trouble with dropping things. This led Dr. Holt to order the September 2010 EMG studies that showed Plaintiff had severe carpal tunnel and cubital tunnel syndrome. However, Plaintiff had no hand complaints when he saw Dr. Holt again in March 2011, his complaints were of left heel pain and leg pain with walking.

The record as a whole, including the background of Plaintiff working three full days a week and using his hands for small engine repair, woodworking and activities of daily living, supports the ALJ's determination that Plaintiff did not have greater hand limitations than those found in his functional capacity evaluation. While Plaintiff correctly points out that the FCE lasted only several hours over the course of two days, the evaluation is designed to "determine safe maximum functional capacity" and Plaintiff's degenerative nerve disease and history of carpal tunnel syndrome were known at that time of testing. (Tr. 1086.) Because a claimant may be found disabled even if he does not meet or equal a listed impairment, the Court must analyze the ALJ's determination of the fourth and fifth steps of the disability evaluation process.

**B.  RFC Determination**

**1.  Medical Opinions**

Plaintiff contends the ALJ failed to give Dr. Holt's August and November 2010 medical opinions appropriate weight under 20 C.F.R. § 404.1527(c). Plaintiff asserts Dr. Holt's opinion reflects Plaintiff's change in condition over time and the combined effect of his low back impairment and neuropathy, whereas the evidence cited by the ALJ did not take these factors into

account.  The Commissioner, on the other hand, asserts the ALJ gave good reasons for assigning minimal weight to Dr. Holt's opinion.  Dr. Holt's 2010 opinions were inconsistent with the FCE, Dr. Cederberg's opinion, Dr. Wendland's opinion, and Plaintiff's daily activities.  Dr. Walcott's opinion, credited by the ALJ, was consistent with the FCE and Drs. Wendland and Cederberg's opinions.  In reply, Plaintiff contends the FCE results and the opinions of Dr. Wendland and Dr. Cederberg did not take into account the deterioration in Plaintiff's back in the Spring of 2010.  Plaintiff further contends that Dr. Walcott's opinion should not be considered substantial evidence because he did not review all of the evidence, particularly Dr. Holt's opinions or the 2010 EMG.

An ALJ can discount a treating physician's opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions.  *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  "The ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole."  *Id.* at 848 (quoting *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001)).  An ALJ may rely on a nonexamining physician's RFC opinion as one factor in the ALJ's RFC determination.  *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (affirming ALJ's decision where ALJ "did not rely solely on the opinion of the consulting physician, but also conducted an independent review of the medical evidence.")

Here, the ALJ properly found that Dr. Walcott's opinion was supported by the objective medical evidence in the record as a whole, particularly the FCE results and the opinions of two physicians who examined Plaintiff after the FCE.  The majority of Plaintiff's examinations for back pain beginning in 2005 were objectively normal, although with some reduced lumbar range of motion, and an MRI showing mild degenerative arthritic changes in his back.  Plaintiff was able to lift 45 pounds in physical therapy in December 2005.  Several examining doctors encouraged him

to return to work in September and October 2006. As Plaintiff's subjective complaints of back and leg pain continued over time, surgery was offered in 2008 (performed in January 2009) when an MRI showed possible compression of a nerve root by a lumbar disc herniation.

Objectively, Plaintiff's functional abilities improved after surgery. In March 2009, Dr. Holt stated Plaintiff had "HNPP which probably precludes full recovery from radiculopathies in his back." But this was not based on objective findings that neuropathy had progressed, but on Plaintiff's subjective complaint that his pain was not gone. Plaintiff's October 2009 functional capacity evaluation is inconsistent with Dr. Holt's opinion of Plaintiff's work restrictions. Dr. Walcott's work restrictions were greater than those of Drs. Cederberg and Wendland, who examined Plaintiff after his FCE. Although Plaintiff complained to Dr. Holt of increasing pain in 2010, he had mild degenerative lumbar changes, and he was treated for plantar fasciitis causing heel pain. While Plaintiff had CMT, a progressive neuropathy, and predisposition to pressure palsy, the record as a whole does not support that these were disabling conditions during the relevant time period. For these reasons, there was superior objective evidence supporting Dr. Walcott's RFC opinion over Dr. Holt's opinion, and the ALJ's weighing of the medical opinions was supported by substantial evidence in the record.

### 2. Credibility

Plaintiff argues his part-time delivery work and work in small engine repair support his good work ethic and are not inconsistent with his subjective complaints of pain and limitations. The Commissioner contends Plaintiff's activity level is inconsistent with disability.

Analyzing the credibility of the claimant's subjective complaints is a component of the RFC determination. *Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005). The ALJ may not discount a claimant's credibility solely because the objective evidence does not fully support his subjective

complaints, but may discount credibility based on inconsistencies in the record as a whole. *Ellis*, 392 F.3d at 996. The ALJ should consider the claimant's prior work record, and observations by third parties and treating and examining physicians regarding the claimant's: 1) daily activities; 2) duration, frequency and intensity of subjective symptoms; 3) precipitating and aggravating factors; 4) dosage, effectiveness and side effects of medication; and 5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The court should not disturb the ALJ's credibility finding if the ALJ provided good reasons supported by substantial evidence for finding the claimant not credible. *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005).

Here, the ALJ provided good reasons for discounting Plaintiff's complaints of disabling pain and functional limitations. In addition to working three full days a week, Plaintiff did small engine repair and woodworking. Plaintiff also received unemployment benefits after leaving his job with the lumberyard, and he looked into retraining or starting a small engine repair business after his back injury. Although Plaintiff did not work full-time, he otherwise worked within the restrictions of his FCE as a delivery person beginning in 2009 and through at least the date of the hearing. (Tr. 214-17, 46-47). These activities are inconsistent with disabling pain and upper or lower extremity dysfunction. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1038-39 (8th Cir. 2001) ("[s]eeking work and working at a job while applying for benefits are activities inconsistent with complaints of disabling pain.") *See Johnson v. Chater*, 108 F.3d 178, 180-81 ("[a]pplying for unemployment benefits 'may be some evidence, though not conclusive, to negate' a claim of disability") (quoting *Jernigan v. Sullivan*, 948 F.2d 1070, 1074 (8th Cir. 1991).

## C.    Hypothetical Question to the Vocational Expert

Plaintiff contends the ALJ's RFC assessment did not accurately describe his manipulative limitations, overstated his ability to work on his feet, and did not restrict his ability to sustain full-

time employment; therefore, the Vocational Expert's testimony does not constitute substantial evidence supporting the ALJ's denial of benefits. In order to rely on a vocational expert's testimony, an ALJ must include all of the claimant's impairments and concrete consequences of those impairments in a hypothetical vocational question. *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008). However, if the ALJ's RFC finding is supported by substantial evidence in the record as a whole and is included in the hypothetical question to the VE, as it was here, the ALJ may rely on the VE's vocational testimony. *Goff v. Barnhart*, 421 F.3d 785, 794 (8th Cir. 2005). Therefore, in this case, the ALJ did not need to include Dr. Holt's opinion of Plaintiff's work restrictions in the hypothetical vocational question.

### D.     Development of the Record

Plaintiff asserts that if the ALJ did not agree with Dr. Holt's opinion, the ALJ should have obtained further medical evidence because his case is complicated by hereditary neuropathy. The Commissioner disagrees, arguing that no crucial issues were left undeveloped, and the record provided an adequate basis to determine Plaintiff's claims. In reply, Plaintiff asserts Dr. Walcott's opinion of Plaintiff's ability to use his hands was made without the benefit of Dr. Holt's opinions or the 2010 EMG. Plaintiff contends the October 2009 FCE was not inconsistent with Dr. Holt's restriction of Plaintiff using his hands only one third of the workday because the FCE involved only 2.25 hours of testing over two days. Plaintiff further contends the FCE does not account for the severity of his back pain in 2010.

All of the issues raised by Plaintiff in support of remand for further development of the record have been addressed above. The ALJ properly discounted Plaintiff's subjective complaints of pain; therefore, remand is not necessary to further develop the record regarding Plaintiff's continued subjective complaints of back and leg pain in 2010. Although Plaintiff had carpal tunnel

and cubital tunnel syndrome in September 2010, this was not new.  Plaintiff was diagnosed with carpal tunnel and Guyon's tunnel syndrome in 2003, and rarely complained to any treatment provider of significant hand symptoms or limitations.  The record provided an adequate basis for the ALJ to make a disability determination; thus, remand is unnecessary.  *See Stormo v. Barnhart*, 377 F.3d 801,  806 (8th Cir. 2004) (finding no crucial issue was undeveloped where several examining physicians provided clinical data and observations about claimant's limitations).

### III.    CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED THAT:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 6] be **DENIED**;

2.    Defendant's Motion for Summary Judgment [Docket No. 15] be **GRANTED;**

3.    If this Report and Recommendation is adopted, that judgment be entered accordingly.

Dated: April 17, 2013                    ___s/ Arthur J. Boylan_____
                                         ARTHUR J. BOYLAN
                                         United States Chief Magistrate Judge

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must

be filed with the Court before May 2, 2013.